IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KIMBERLY SUE GLANZ,**                        Case No. 5:17 CV 1437

    Plaintiff,                                        Judge Benita Y. Pearson

    v.                                                 Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                        REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Kimberly Sue Glanz ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated June 21, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed in part, and reversed and remanded in part.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI on November 28, 2012, alleging a disability onset date of October 1, 2012. (Tr. 159-63).[1] Her claims were denied initially and upon reconsideration. (Tr. 113, 127). Following a hearing (Tr. 30-49), an ALJ found Plaintiff note disabled in a written decision dated September 12, 2014 (Tr. 14-25). After the Appeals Council denied review (Tr. 1-3), Plaintiff

---

1. Plaintiff filed a previous application for SSI, which was denied by an ALJ in 2010. (Tr. 90-98). She did not appeal this decision.

appealed the decision to the United States District Court, and the case was remanded in a decision dated December 23, 2015. *See Glanz v. Comm'r of Soc. Sec.*, Case No. 5:16 CV 241 (N.D. Ohio) (Doc. 17). On remand, the Appeals Council vacated the ALJ's decision and remanded the case for a new hearing and decision. (Tr. 521).

Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on March 23, 2017. (Tr. 473). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 446-48); 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on July 9, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in May 1971, making her 41 years old on her application date and the alleged onset date.  (Tr. 478).  Plaintiff has at least a high school education. *Id*. She lived at home with her 27 year-old son. (Tr. 479). Plaintiff had past work as an insurance claims representative and a telephone solicitor. (Tr. 46). She last worked in April 2013, but was terminated due to illness-related absences. (Tr. 166).

Plaintiff was undergoing treatment for HIV, and took several medications to combat the disease. (Tr. 482). She had her thyroid removed in 2012 due to complications from HIV. (Tr. 483). Plaintiff testified she still experienced symptoms of depression, but was no longer on medication, and did not attend professional counseling due to transportation issues. (Tr. 484). Plaintiff no longer drove due to vision problems and neuropathy. (Tr. 486). She often had difficulty sleeping due to incontinence issues. *Id.*; Tr. 489.

In her spare time, Plaintiff watched television, played on the computer, read, did puzzles, and colored. *Id*. Plaintiff performed household chores such as cooking and cleaning. *Id*. She walked to a small market across the street from her home for groceries. (Tr. 487).

Relevant Medical Evidence

Plaintiff contracted HIV in 2004 and has undergone treatment ever since. (Tr. 311).  During a July 2012 office visit with Erin Scott, M.D., Plaintiff's CD4[2] levels were "8". (Tr. 312).

In December 2012, Plaintiff saw Michael Tan, M.D., an infectious disease specialist. (Tr. 286). Dr. Tan noted Plaintiff had severe fatigue, confusion, and headaches after her four-hour shifts at work. *Id*. Plaintiff also had trouble with diarrhea. *Id*. Dr. Tan wrote a letter regarding Plaintiff's condition after the office visit and made some recommendations. (Tr. 298). He wrote:

> [Plaintiff] was seen in our office today for routine care. She is doing well with medical therapy; however, given her rapid acceptance of new responsibilities and re-entry into the workforce, she is having more difficulty with attention and anxiety. She will be making attempts to see her primary care physician to see if further medical interventions will help her adjustment. In the meantime, it would be appropriate for [her] to be reduced to shorter shifts, or shorter shifts with more frequency. From my discussions with the patient, she would be most suited to shifts limited to 4 hours, but she does seem amenable to more frequent, though shorter shifts.

*Id*.

Further, Dr. Tan also indicated that Plaintiff's HIV was improving with medication.  *Id.* at 285.  His treatment notes stated:

---

2. "CD4 cells are a type of white blood cell. They are specialized cells of the immune system that are destroyed by HIV. A CD4 count measures how many CD4 cells are in your blood. The higher your CD4 cell count, the healthier your immune system. The CD4 count of an uninfected adult/adolescent who is generally in good health ranges from 500 cells/mm$^3$ to 1,600 cells/mm$^3$. In contrast, if HIV has destroyed so many CD4 cells that you have a CD4 count of fewer than 200/mm$^3$, you are considered to have progressed to stage 3 (AIDS), the most advanced stage of HIV infection." HIV.gov, U.S. Department of Health and Human Services, *available at* https://www.hiv.gov/hiv-basics/staying-in-hiv-care/provider-visits-and-lab-test/lab-tests-and-results (last visited June 24, 2018).

> Biggest issue now appears to be anxiety and depression.  Although I do think patient can work, with her strict adherence to medication, and with her social change to re-enter the workforce, feel she is adding to her anxiety.  At present, probably best if she can stick to shorter and more frequent shifts.  Will provide some documentation for work.

*Id*.

Later in December 2012, Plaintiff was examined by Megan Kamath, M.D. (Tr. 305-07)[3]. Plaintiff's primary complaints were depression and anxiety, and an HIV medication adjustment. (Tr. 305). Physical examination revealed no abnormalities, but Plaintiff was anxious and tearful. *Id*. Dr. Kamath prescribed an anti-depressant, and provided an updated letter for Plaintiff's employer to explain Plaintiff would need one day off per week "to optimize medical care". (Tr. 306). In her notes, Dr. Kamath that she reviewed Dr. Tan's letter. *Id*.

In May 2013, Plaintiff saw Erin. Scott, M.D., for a follow-up on her depression and anxiety. (Tr. 423). Plaintiff refused to take anti-depressants because she "didn't want to take any more medications". *Id*. She had been recently fired for attendance issues. *Id*. Plaintiff appeared angry and frustrated. (Tr. 425). Plaintiff refused counseling due to transportation issues, and because she felt she would not benefit. *Id*.

Plaintiff saw Dr. Tan in June 2013 for an HIV follow-up. (Tr. 386). Dr. Tan found Plaintiff was doing well with her current medication plan, and that her viral load was well-suppressed. *Id*. A physical exam was normal, and Plaintiff had a normal mood and affect. (Tr. 387).

In September 2013, Plaintiff saw Dr. Scott for a follow-up. (Tr. 426). Plaintiff reported frustration and anger at her financial situation with her disability being denied. *Id*. Plaintiff reported she suffered from depression and lost her job due to her inability to concentrate. *Id*. She

---

3. These records are duplicated at Tr. 361-63.

reported extreme fatigue and requested a prescription for a handicap placard. *Id*. Dr. Scott prescribed Zoloft for depression and anxiety. (Tr. 428).

Plaintiff followed up with Dr. Scott in October 2013. (Tr. 430). She reported her depression improved, but she experienced weight loss and loose stools as a side effect of her medication. *Id*. Dr. Scott prescribed Mirtazapine. (Tr. 432). In November 2013, Plaintiff noted an improvement in her depression, and was "no longer crying all the time". (Tr. 434). Plaintiff complained of anxiety and other stressors. (Tr. 436). Dr. Scott increased her medication dosage. *Id*.

Plaintiff also saw Dr. Tan in November 2013. (Tr. 382). Dr. Tan found Plaintiff was "doing well" with her current medications. *Id.* She had a normal physical exam, and an appropriate mood and affect, though she "seem[ed] a bit angry". (Tr. 385).

Plaintiff saw Dr. Scott in April 2014 for a follow-up. (Tr. 437). She reported a "very stressful winter", but did not seek medical support. *Id*. Plaintiff reported laying in bed all day and "did nothing". *Id*. Plaintiff also reported worsening incontinence. *Id*. Dr. Scott again encouraged Plaintiff to seek counseling services. (Tr. 439).

Plaintiff saw Dr. Tan again in May 2014. (Tr. 378). Dr. Tan noted "[p]atient's CD4 is the best it has been on therapy", and "if [she is] able to maintain CD4 . . . through next visit, [she] can probably stop dapsone/PCP prophy." *Id*. A physical examination was normal, and Plaintiff had an appropriate mood and affect. (Tr. 381).

In May 2014, Plaintiff saw Dr. Scott for a follow-up on her thyroid condition and HIV. (Tr. 441). Plaintiff reported anxiety, trouble sleeping, fatigue, heat intolerance, racing thoughts, decreased energy, worsening concentration, and moderate anhedonia. (Tr. 442). Plaintiff reported severely impaired concentration. *Id*.

Plaintiff saw Emily George, M.D., in October 2014. (Tr. 722). Dr. George assessed depression, anxiety, peripheral neuropathy, high cholesterol, tobacco use, renal disease, hyperthyroidism, and HIV. (Tr. 723-24). Dr. George wrote, "at this point, I feel like her mental state is interfering with any emotional healing as well as physical healing that needs to happen." (Tr. 723).

Plaintiff saw Dr. Tan in December 2015 for an HIV follow-up. (Tr. 651). Plaintiff was "doing well", but had occasional issues with incontinence. *Id*. Plaintiff was fatigued and seemed nervous/anxious. (Tr. 652).

Plaintiff saw Dr. George in February 2016 for an annual follow-up. (Tr. 754). She reported some incontinence and sleep difficulties, but was otherwise "doing well". *Id*. Physical examination revealed Plaintiff was well-developed and well-nourished, with a normal mood and affect. *Id*.

In June 2016, Plaintiff saw Dr. Tan. (Tr. 670). Plaintiff's mood was "up and down", and she reported sleep disturbances. *Id*. Her CD4 was 313. *Id*. Plaintiff reported fatigue and occasional numbness. (Tr. 671). Plaintiff was "doing well" with her medication, and Dr. Tan requested she return in six months. (Tr. 672).

Plaintiff saw Dr. Tan again in February 2017. (Tr. 793). Plaintiff reported sleep difficulties and bloating. *Id*. She reported tolerating her medication well. Id. Plaintiff had a normal mood and affect, but seemed nervous/anxious. (Tr. 796). Dr. Tan described her has "overall doing well with therapy" with a stable CD4 level, and her viral load was well suppressed. (Tr. 798). Dr. Tan found that Plaintiff could probably be seen once per year, but may require twice a year visits for coverage purposes. *Id*.

Opinion Evidence

*Treating Physician Dr. Scott*

In May 2014, Dr. Scott provided a medical source statement. (Tr. 260-62). Dr. Scott found

Plaintiff had repeated episodes of severe involuntary weight loss due to Graves' disease, along

with episodes of insomnia. (Tr. 261). Plaintiff had marked difficulties in maintaining social

functioning and completing tasks in a timely manner due to concentration issues. *Id*. She had no

significant side effects from medications. *Id*. Dr. Scott opined Plaintiff could not work, and could

not stand. (Tr. 262). Dr. Scott opined Plaintiff could sit for four hours at a time, and could not lift

any weight on an occasional or frequent basis. *Id*.  She found Plaintiff had a "moderate" limitation

in her ability to understand and carry out short tasks with simple instructions. *Id*. Plaintiff had a

"marked" limitation in her ability to understand and carry out detailed instructions. *Id.* Further, she

had a "marked" limitation in her ability to interact with the public, accept supervision, and get

along with co-workers. *Id*. She was "extremely impaired" in her ability to work with others, and

maintain concentration. *Id*.

*Treating Physician Dr. Tan*

In December 2012, Dr. Tan wrote a letter regarding Plaintiff's condition after an office

visit and made some recommendations. (Tr. 298). He wrote:

> [Plaintiff] was seen in our office today for routine care. She is doing well with
> medical therapy; however, given her rapid acceptance of new responsibilities and
> re-entry into the workforce, she is having more difficulty with attention and anxiety.
> She will be making attempts to see her primary care physician to see if further
> medical interventions will help her adjustment. In the meantime, it would be
> appropriate for [her] to be reduced to shorter shifts, or shorter shifts with more
> frequency. From my discussions with the patient, she would be most suited to shifts
> limited to 4 hours, but she does seem amenable to more frequent, though shorter
> shifts.

*Id*.

*Treating Physician Dr. Kamath*

Later in December 2012, Dr. Kamath provided an updated letter for Plaintiff's employer to explain Plaintiff would need one day off per week "to optimize medical care". (Tr. 306). In her notes, Dr. Kamath that she reviewed Dr. Tan's letter. *Id.*

*Examining Physician Dr. Bard*

In March 2013, Plaintiff underwent a consultative psychological evaluation with E.M. Bard, Ph.D. (Tr. 341-46). Plaintiff reported symptoms of depression, lethargic, and crying spells. (Tr. 343). Dr. Bard found Plaintiff to be "slightly irritable" and "quite opinionated". *Id.* He found Plaintiff had "no limitation" in understanding, remembering, and carrying out instructions; and had "the competencies to perform simple tasks". (Tr. 345). Plaintiff's ability to perform multi-step tasks would be "dependent on the level of technical skills required". *Id.* Dr. Bard concluded Plaintiff would be "limited in her ability to deal with pressures in a full time competitive work setting." (Tr. 346). Dr. Bard diagnosed a dysthymic disorder with late onset. (Tr. 345).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 494-501. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way the ALJ determined Plaintiff was. (Tr. 496). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a mail sorter, routing clerk, or an inspector. (Tr. 496-97).

ALJ Decision

The ALJ made the following findings of fact and conclusions of law in his April 14, 2017 decision:

> 1.  The claimant has not engaged in substantial gainful activity since November 12, 2012, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments:  human immunodeficiency virus (HIV), depression, anxiety disorder, and Grave's disease (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined 20 CFR 416.967(b) except she cannot climb ladders, ropes, or scaffolds.  She can occasionally climb ramps and stairs.  The claimant must avoid concentrated exposure to temperature extremes of hot and cold.  She must avoid workplace hazards, such as unprotected heights or dangerous moving machinery.  She is limited to tasks that can be learned in thirty days or less.  The claimant cannot perform piece rate work or assembly line work.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on May 3, 1971, and was 41 years old, which is defined a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since November 12, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 449-61).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

    1.     Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two assignments of error for review. First, Plaintiff alleges the ALJ violated the principles set forth in *Drummond v. Commissioner of Social Security,* 126 F. 3d 837 (6th Cir. 1997), by changing the prior ALJ's RFC finding without explaining what new and material evidence necessitated the change. (Doc. 13, at 7). Second, Plaintiff alleges the ALJ erred in substituting his own judgment for the opinions of Plaintiff's treating sources. *Id.* at 13. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. For the reasons outlined below, the undersigned recommends the decision of the Commissioner be affirmed in part, and reversed and remanded in part.

*Drummond*

In *Drummond*, the Sixth Circuit held the Commissioner is bound by its prior findings with regard to a claimant's RFC unless new evidence or changed circumstances require a different finding. *Drummond,* 126 F.3d. at 842. Further, Social Security Acquiescence Ruling 98–4(6) mandates:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98–4(6), 1998 WL 283902, at *3.

It is Plaintiff's burden to show that circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Jones v. Comm'r of Soc. Sec.*, 2015 WL 4394423, at *5 (N.D. Ohio) (quoting *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988, at *8 (E.D. Mich.), *report and recommendation adopted*, 2011 WL 4502955). Such evidence is new only if it was "not in existence or available to the claimant at the time of the [prior] administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Such evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

Here, there are two prior ALJ decisions at issue, the 2010 and 2014 decisions. (Doc. 13, at 8). As the Commissioner correctly points out, however, the 2014 decision was vacated (Tr. 11-13), and is therefore not a relevant prior decision. (Doc. 14, at 9). The RFC finding in the 2010 decision was:

12

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can only stand for a total of 4 hours in an 8-hour workday, for 1 hour uninterrupted; she can sit for a total of 4 hours in an 8-hour workday, for 2 hours uninterrupted; and she also requires a sit/stand option and can only perform simple work. In addition, [Plaintiff] cannot be exposed to extreme temperatures, dampness or hazardous conditions. She cannot have contact with the public (due to her fear of being over-exposed to germs and viruses). However, she can interact with coworkers and supervisors.

(Tr. 94).

> Plaintiff asserts the 2017 RFC diverges from the previous RFC in two significant ways:

> (1) [the ALJ's] 2017 decision found that Ms. Glanz could perform light work, which involves standing/walking up to six hours a day, with no sit/stand option and no additional sitting or standing limitations and

> (2) [the ALJ's] 2017 decision allows for occasional contact with all others, including the public.

(Doc. 13, at 9) (citing Tr. 18)  Plaintiff's brief inaccurately cites the 2014 decision ("Tr. 18"), while actually discussing the 2017 decision.  *Id.*  This incorrect citation also leads to a factual error in Plaintiff's second argument above:  It is the 2014 decision which stated the "claimant can have occasional interaction with others" (Tr. 18), not the 2017 decision, which contains no limitations concerning interaction with others, *see* Tr. 454.  The 2010 decision addressed the issue as follows: "[Plaintiff] cannot have contact with the public (due to her fear of being over-exposed to germs and viruses).  However she can interact with coworkers and supervisors."  (Tr. 94).

Plaintiff's brief contains one further inaccuracy.  Plaintiff asserts, in order to alter the prior RFC finding, the ALJ was required to explain how new and material evidence supported a change. (Doc. 13, at 9) (citing *Drummond*, 126 F.3d at 843; AR 98-4(6)).  Plaintiff argues the 2017 decision is faulty in part because the explanation concerning "new and material evidence" is identical to that in the vacated 2014 decision, therefore the 2017 decision "in no way rectified the error committed by the ALJ in 2014."  (Doc. 13, at 9).  The quotations that Plaintiff provides in support

13

of this argument, however, are not accurate.  Plaintiff accurately quotes this portion of the 2017
decision:

> In this case, there is new and material evidence pertaining to the unadjudicated
> period that changes the prior [RFC].  Consequently, I find that the claimant's
> condition has changed since the prior [ALJ]'s decision, as described in further detail
> below in the opinion analysis.  Therefore, I am not bound to adopt the [RFC] used
> in the prior opinion.

(Doc. 13, at 9).[4]  Plaintiff then purports to quote a portion of the vacated 2014 decision:

> In this case, there is new and material evidence pertaining to the unadjudicated
> period that changes the prior [RFC].  Consequently, I find that the claimant's
> condition has changed since the prior [ALJ]'s decision, as described in further detail
> below in the opinion analysis.  Therefore, I am not bound to adopt the [RFC] used
> in the prior opinion.

*Id.* (emphasis added).  The underlined phrase, however, does not actually appear in the vacated
2014 decision, and is a new addition that appears in the 2017 decision.  *Compare* Tr. 449, *with* Tr.
14.

Plaintiff asserts the first *Drummond* violation is that the 2017 RFC diverges, without
evidentiary support, from the 2010 decision. (Doc. 13, at 9). Specifically, Plaintiff argues the 2017
decision found Plaintiff could perform light work with no sit/stand option, and no additional sitting
or standing limitations. *Id*.  The 2010 ALJ decision found Plaintiff could perform light work, but
with the added limitations that she could only stand four hours total, and one hour at a time; could
only sit four hours total, and two hours at a time; and would require a sit/stand option.  (Tr. 94).

Plaintiff concedes (Doc. 13, at 10) the ALJ attempted to correct his error by adding the
following paragraph to justify eliminating the prior standing/walking limitations:

> The record is consistent with the finding that the claimant was generally limited to
> light work.  However, new records fail to document the need for further standing
> or sitting limitations.  Likewise, there is little support for a finding that the claimant

---

4. (Here, Plaintiff's brief states they are quoting Tr. 14, when this excerpt comes from the 2017
decision at Tr. 449).

required the option to alternate between sitting and standing.  The claimant had relatively conservative treatment and largely normal [leg] function on exam.  Indeed, she walked to the store and she gardened, along with performing numerous other daily activities.  Additionally, the treatment notes did not reflect substantial problems sitting or standing.  Such facts suggest that the claimant could perform the full stand and walking functions associated with light work.

(Tr. 458).  Plaintiff argues that "what is missing . . . is any citation whatsoever to any evidence of record."  (Doc. 13, at 10).

Although the ALJ stated "new records fail to document the need for further standing or sitting limitations" without specific citation to the record at that point, the ALJ discussed the new evidence earlier. *See* Tr. 455-56. It is not necessary for the ALJ to repeat the evidence which had already been presented earlier in the decision.  *See, e.g.*, *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-66 (6th Cir. 2014); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 725 (6th Cir. 2013) ("Neither *Drummond* nor SSAR 98-4(6) require the ALJ to make specific comparisons with the evidence supporting the prior final decision.").

Earlier in his 2017 opinion, the ALJ found Plaintiff's condition had changed since the prior decision, "as described in further detail below in the opinion analysis."  (Tr. 449).  The ALJ discussed in some detail the medical evidence of record in assessing Plaintiff's RFC.  *See generally* Tr. 455-56.  Because the Plaintiff alleged an onset date of October 2012, the ALJ's focus was properly on evidence since the prior ALJ's decision.  *See, e.g.*, *Rudd*, 531 F. App'x at 725-26.

The ALJ pointed to evidence of some changed improvement. For example, the ALJ noted that at a November 2013 follow-up appointment with Dr. Tan, Plaintiff was doing relatively well.  (Tr. 455) (citing Tr. 383).  She displayed normal gait and strength, with no apparent joint swelling or range-of-motion issues.  *Id.* (citing Tr. 384).  The ALJ also indicated, at an April 2014 follow-up appointment with Dr. Scott, Plaintiff said her condition had improved in the past month, with

improved appetite and weight gain.  (Tr. 456) (citing Tr. 437-38).  Her exam was normal, with no weakness or fatigue.  *Id.*

The ALJ noted Plaintiff's HIV lab values continued to improve (Tr. 456) (citing Tr. 378 "CD4 is the best it has been on therapy"), and she regained some of her lost weight, *id*. Further, the ALJ stated Plaintiff's HIV appeared to be largely stable at her November 2014 and June 2015 follow-ups with Dr. Tan.  (Tr. 456) (citing Tr. 678-81).  Although Plaintiff reported some neuropathy symptoms on her hands and feet at an October 2014 appointment with Dr. George, the ALJ noted Plaintiff had normal extremity strength and neurological functioning on examination. *Id.* (citing Tr. 722-23).

The ALJ further noted Plaintiff was doing well at a December 2015 follow-up with Dr. Tan, and a February 2016 exam with Dr. George.  (Tr. 456) (citing Tr. 666, 754).  In a February 2016 visit, Dr. Tan indicated Plaintiff was doing well with therapy, that she remained largely compliant with her regimen, and that her CD4 was stable.  *Id*. (citing Tr. 798).

In sum, the ALJ's decision provided new and material evidentiary support, with citations to the medical evidence of record, for the change from the prior ALJ's RFC finding.  The ALJ's determination that Plaintiff could perform light work without additional sitting or standing limitations during the relevant time period is supported by substantial evidence.  Therefore, the undersigned recommends the Commissioner's decision be affirmed in this regard.

Treating Physician

Plaintiff next argues the ALJ violated the treating physician rule[5] when he failed to "give deference to the treating physicians, and substitut[ed] his own judgment for the opinions of medical

---

5. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes were effective for claims *filed after* March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the*

sources". (Doc. 13, at 15). Further, she asserts the ALJ "rejected or reduced the weight given to every single medical opinion of record". *Id.* Plaintiff asserts the opinions were rejected without good reasons. *Id.* The Commissioner responds that substantial evidence supports the ALJ's evaluation of the opinion evidence. (Doc. 14, at 14). For the reasons outlined below, the undersigned recommends the decision of the Commissioner be reversed and remanded in this regard for reconsideration of the opinions of Drs. Kamath and Tan.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)).

An ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010).

---

*Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Here, Plaintiff filed for DIB on November 28, 2012 (Tr. 159-63), so the Commissioner's brief is incorrect where it asserts the new regulations should be used to evaluate this opinion (Doc 14, at 14 n.3).

When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Tan*

Plaintiff argues the ALJ improperly discounted the opinion of treating physician, Dr. Tan. (Doc. 13, at 18). The ALJ assigned little weight to the opinion of Dr. Tan, finding "[t]he treatment notes did not show substantial anxiety or concentration problems that necessitated shorter shifts". (Tr. 457). As with Dr. Kamath below, this is clearly inaccurate. At a December 2012 exam, Dr. Tan indicated that Plaintiff's HIV was improving with medication. *Id.* at 341. His treatment notes also stated:

> Biggest issue now appears to be anxiety and depression. Although I do think patient can work, with her strict adherence to medication, and with her social change to re-enter the workforce, feel she is adding to her anxiety. At present, probably best if she can stick to shorter and more frequent shifts. Will provide some documentation for work.

(Tr. 285). Dr. Tan did compose a letter following the office visit, dated December 11, 2012:

> [Plaintiff] was seen in our office today for routine care. She is doing well with medical therapy; however, given her rapid acceptance of new responsibilities and re-entry into the workforce, she is having more difficulty with attention and anxiety. She will be making attempts to see her primary care physician to see if further medical interventions will help her adjustment. In the meantime, it would be appropriate for [her] to be reduced to shorter shifts, or shorter shifts with more frequency. From my discussions with the patient, she would be most suited to shifts

18

limited to 4 hours, but she does seem amenable to more frequent, though shorter shifts.

*Id*. Here, Dr. Tan suggested it would be appropriate for Plaintiff "to be reduced to shorter shifts, or shorter shifts with more frequency." (Tr. 298). The ALJ's finding that Plaintiff's "treatment notes did not show substantial anxiety or concentration problems that necessitated shorter shifts", is clearly unsupported. (Tr. 457). This was the ALJ's only reason for discounting Dr. Tan's opinion, and it is directly contradicted by the treatment notes above which explicitly state that Plaintiff needed shorter shifts due to attention and anxiety issues. *Id*. (citing Tr. 285).

Here, the ALJ's decision assigning little weight to the opinion of treating physician Dr. Tan is not supported by substantial evidence, and the decision should be remanded for a reconsideration of Dr. Tan's opinion in regard to the work restrictions he assessed in the December 2012 letter.

*Dr. Kamath*

Next, Plaintiff argues the ALJ improperly discounted the opinion of treating physician, Dr. Kamath. (Doc. 13, at 16). The ALJ assigned little weight to the opinion of Dr. Kamath, finding "*as noted above*, the evidence did not support the need for shorter shifts". (Tr. 457) (emphasis added). Further, he found the treatment notes did not document the need for additional days off. *Id*. Specifically the treatment notes did not show "substantial anxiety" which necessitated shorter shifts. *Id*. The ALJ found it was unclear if Dr. Kamath was asserting Plaintiff required additional days off, or that she simply required one day off per week. *Id*.

In the paragraphs "*above*", referenced by the ALJ, he discussed Dr. Kamath's treatment notes indicating Plaintiff complained of depression and anxiety, had stress in many areas of her life, and the medications were not helping. *Id.* (citing Tr. 305) (Plaintiff stated she "was running on the hamster wheel of life and not able to get off", and her medication was not working). Dr.

Kamath concurred with Dr. Tan's finding that Plaintiff should be on a reduced schedule.  Tr. 306 ("I also provided [Plaintiff] with an updated letter for her employer which explained that we would recommend her having 1 day off a week to optimize medical care").  Dr. Kamath agreed with Dr. Tan's recommendation that Plaintiff have a reduced schedule due to anxiety, and even offered to provide a work letter to support it. *See id.* As with Dr. Tan's opinion, the ALJ's only reason for discounting Dr. Kamath's was that the "evidence does not support the need for shorter shifts . . . [and] the treatment notes did not document the need for additional days." (Tr. 457).  This is directly contradicted by the treatment notes above which explicitly state that Plaintiff needed a reduced work schedule due to attention and anxiety issues. *Id.* (citing Tr. 285).

Under the treating physician rule, Dr. Kamath's opinion should be given controlling weight if her opinion is well-supported and not inconsistent with other substantial evidence in the record. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. Here, the ALJ's decision assigning little weight to the opinion of treating physician Dr. Kamath is not supported by substantial evidence because it is inconsistent with other substantial evidence in the record, and the decision should be remanded for a reconsideration of Dr. Kamath's opinion.

*Dr. Bard*

Next, Plaintiff argues the ALJ's "ignored a critical functional limitation described by Dr. Bard, a consultative psychologist." (Doc. 13, at 17).

As an initial matter, an examining, but not treating, source is one who has examined Plaintiff, but did not have an ongoing treatment relationship. 20 C.F.R. §§ 404.1527 and 404.1502; SSR 96-2, 1996 WL 374188 at *1. This includes state agency physicians whose opinions must be

20

considered by the ALJ. *Id.* Consultative examiners are evaluated under the same statutory factors as treating physicians, however, the ALJ is not required to provide "good reasons" for the weight given. *Warner v. Comm'r Soc. Sec.*, 375 F.3d at 387, 391 (6th Cir. 2004); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only treating source" opinions). Here, Dr. Bard examined Plaintiff on one occasion, March 11, 2013, for a psychological assessment through the Ohio Division of Disability Determination. (Tr. 341-46).

The ALJ "gave weight" to Dr. Bard's opinion.  (Tr. 457).  The ALJ recognized that Dr. Bard assessed Plaintiff might have limited ability to handle work stress.  *Id.*  He noted:  "The claimant's ongoing depression and anxiety symptoms were consistent with such findings."  *Id.* The ALJ also determined that "the claimant's largely appropriate behavior at exams suggests that she could interact appropriately with others."  *Id.*  Although Dr. Bard opined Plaintiff had a tendency to be outspoken and somewhat oppositional to supervisors at work, and was opinionated and sarcastic, he did not assign any related limitations.  (Tr. 344-45).  Dr. Bard did not opine that Plaintiff was limited in her ability to interact with others in the workplace.  *Id.*  The Court therefore does not find error in the lack of an RFC limitation, based on Dr. Bard's opinion, concerning the ability to interact with others and finds the ALJ's opinion supported by substantial evidence in this regard.

### *Doctors Healy and George*

Finally, Plaintiff contends that "the ALJ ignored opinions from additional treating sources who reported that [Plaintiff] had significant mental limitations."  (Doc. 13, at 17-18).   The allegation is raised in a single paragraph, and supported by various comments in treatment notes from several providers.  *Id.*  For example, Plaintiff asserts that "Dr. Healy, a treating orthopedist,

noted that [Plaintiff's] pain was interfering with her ability to function, as was her depression." *Id.* at 17 (citing Tr. 314).  Reference to the cited treatment notes show that Dr. Healy was noting Plaintiff's complaint that she "[h]as been very tired and had some pain. . . . [and was] concerned that her pain is affecting here ability to function." (Tr. 314). He noted there [m]ay be a depression component has had HIV for 6 years." *Id.* Dr. Healy did not make a related diagnosis of any mental health problem, nor did she opine any limitations arising out of Plaintiff's comments. *Id.*

Plaintiff next argues Dr. George stated Plaintiff's mental state was interfering with her emotional healing process.  (Doc. 13, at 18) (citing Tr. 723).  Reference to the October  2014, progress note shows Dr. George treated Plaintiff for depression with anxiety by updating her prescriptions, commenting that, "Patient needs to see behavioral health.  At this point, I feel like her mental state is interfering with any emotional healing as well as physical healing that needs to happen." (Tr. 723).  She noted Plaintiff had "seen behavioral health multiple times in the past and has resisted going to counseling because 'it is another doctor to go to.'" (Tr. 722).  In her treatment note, Dr. George did not opine any limitations arising out of Plaintiff's comments.  *See generally id.* at 722-23.

Neither doctor made a diagnosis of a mental health impairment, nor did they opine any limitations. Moreover, while the ALJ must consider all the evidence in the record, there is no requirement that the ALJ discuss every single piece of evidence.  *See, e.g.*, *Atkinson v. Astrue*, 389 F. App'x 804, 807 (10th Cir. 2010); *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  It is clear from the decision that the ALJ reviewed Dr. George's treatment notes, *see* Tr. 456 (citing Tr. 723), and Dr. Healy's treatment notes, *see* Tr. 455 (citing Tr. 314-15).   The undersigned finds no error in the ALJ's consideration of these physicians, and finds the ALJ's decision supported by substantial evidence in this regard.

**CONCLUSION AND RECOMMENDATION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI not supported by substantial evidence in certain regards as set forth above and recommends the decision be affirmed in part, and reversed and remanded in part to address the opinion of Doctors Kamath and Tan.


 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).